Whitaker, Judge,
delivered the opinion of the court:
Plaintiff sues for reasonable and entire compensation for the unauthorized use of its patent by the United States. Plaintiff is the assignee of Daniel Mapes, patentee under United States Patent No. 2,521,526 issued September 30,1950.
*457 The only issue now before us is the validity of plaintiff’s patent. If it is valid, there can be no doubt that defendant infringed it.
Plaintiff’s patent is on a charge for a carbon dioxide container, such as a fire extinguisher, for use in extremely cold temperatures, and on methods for filling the container with the charge.
The ordinary fire extinguisher of this type is filled with carbon dioxide that has been subjected to sufficient pressure to liquefy it. It works satisfactorily at temperatures between zero and 140° Fahrenheit. At below zero temperatures the passage between the valve at the top of the container and the orifice, through which the liquid carbon dioxide escapes into the outside air, tends to become clogged with solid carbon dioxide, and, in addition, the pressure of the carbon dioxide in the container is greatly decreased. The clogging and the decreased pressure result in an unsatisfactory discharge, or none at all.
Plaintiff’s patent is designed to remedy the condition which exists at these extremely low temperatures. It accomplishes this by the removal of some of the carbon dioxide and the injection of sufficient nitrogen, or any other gas that is chemically inactive with carbon dioxide, and which has a critical temperature of —80.5° F. or less, to bring up the pressure in the container to at least 200 pounds per square inch at —60° F. It found that this prevented clogging in the outlet passage and produced a steady, uninterrupted flow of the carbon dioxide.
1. Defendant says that such a charge is not patentable because the result accomplished was no more than could be expected by the application of well known laws relating to gases.
This position is contrary to the testimony of the experts, both for the plaintiff and for the defendant. They both say that the normal expectation from an increase in the pressure within the chamber at these sub-normal temperatures would be more solid carbon dioxide, or dry ice, or snow, as it is often called, in the passageway, and, hence, more clogging. This is because the cooling effect, incident to the release of the liquid from the pressure within the chamber, *458 is increased as the pressure in the chamber is increased. Therefore, when the liquid carbon dioxide in the chamber is very cold, the additional cooling due to the escape from higher pressures would, according to known laws, tend to create more solid carbon dioxide and, hence, more clogging; the greater the pressure within the chamber the greater the cooling effect on escape.
But, for some reason, as yet not clearly known, the increase in the pressure in the chamber by the use of an inert gas tends to eliminate solidification of the carbon dioxide in the outlet passage. Plaintiff does not know exactly why, its experts do not, nor do defendant’s. But it works. Plaintiff is not required to show precisely why it does.
• Plaintiff’s invention was, therefore, novel, and is patentable.
John H. Cantlin, an officer in the United States Army, made the same discovery that Mapes, the patentee, had made earlier. He filed an application for patent on it some eleven months after the Mapes’ application was filed. His application was prosecuted by the United States Army Air Force. Cantlin described his invention as follows:
Pursuant to the present invention, the carbon dioxide container or system is supercharged with dry nitrogen gas, preferably under sufficient pressure to insure proper functioning of the apparatus at all temperatures between approximately —70° F. and +160° F.
Army Air Force counsel argued in favor of the allowance of Ca.ntlin’s claims as follows:
Applicant’s invention having been fully accepted and put to use in answer to a heretofore unsolved difficulty there would seem to be no room for doubt as to the opera-tiveness of the invention. The invention has been adopted by the U. S. Army Air Force- as shown by the Technical Order. The observance of such Orders is mandatory in the Air Forces and the promulgation thereof is based on general acceptance of the improvement by means of extensive service tests, not on a mere suggestion by some one individual, nor on the basis of a few successful experiments.
Interference proceedings were instituted between the Mapes and Cantlin applications. When Mapes showed that *459 be bad made tbe discovery some three years before Cantlin, Cantlin withdrew, tbe interference proceedings were dissolved, and the patent was issued to Mapes.
All this time at tbe instance of defendant, the Massachusetts Institute of Technology and various others had been trying to find a solution to the problem. Mapes solved it. Whether fortuitously or by supernatural divination, he nevertheless solved it.
2. Next, defendant says, the claims are lacking in criticality. We suppose defendant means by this they are not definite enough. It seems to us they are as definite as they could be in order to apply them to the varying situations that could be expected to arise. If the extinguisher was intended for use in an airplane, where the ground temperature was 140° F. and the temperature at the height to which the airplane was expected to ascend was —60° F., you could use only enough nitrogen to exert a pressure of 200 pounds per square inch at —60° F., because if you had a higher pressure, the container might explode when the airplane returned to the 140° temperature. But this would not apply where the temperature extremes were not so great.
Hence, the patentee, after prescribing the use of a gas inert to carbon dioxide, with a critical temperature below —80.5° F., specified that you should use a combined charge that would have less pressure at 140° F. than a normal charge of carbon dioxide at 140° F., and yet enough to exert a pressure of at least 200 pounds per square inch at —60° F.
In the specifications the patentee set forth IT examples in which he listed the number of pounds of carbon dioxide in the chamber, the pressure of the nitrogen to be injected, the ratio of the nitrogen to the carbon dioxide by weight and the gauge pressure of the resultant charge at varying temperatures. By following the instruction of the claims and by the use of this table, the amount of nitrogen to be injected could be determined in accordance with the situation to be encountered.
3. Defendant says plaintiff’s patent was anticipated by the prior art. Defendant had been trying zealously to find a means of eliminating clogging at extremely low temperatures without success. It had employed the most skilled *460 scientists to do so. This would have been unnecessary if the prior art supplied the answer.
There is no doubt that the prior art teaches the use of carbon dioxide and nitrogen to expel a fire extinguishing medium, or to form a protective covering. The Daney patent, issued in 1913 (finding 22) and the Muchka patent issued in 1922 (finding 23) are illustrative of this practice. Furthermore, the Levy, Phillips & Pain, and Odell references teach the use of nitrogen as an expellant for gases or liquids having such low vapor pressures at low temperatures that they are unable to expel themselves from their containers. However, none of these were concerned with the problem of clogging of the outlet passage at low temperatures, which was solved by Mapes, nor do they teach its solution.
The Hasche patent (finding 19) was for a method of making dry ice. Hasche used the pressure of nitrogen gas to force refrigerated carbon dioxide from its container. Hasche’s object was to produce dry ice; in the instant patent, the object was to prevent the production of solid dry ice within the discharge passage. The solution of a stoppage or clogging problem was not attempted by Hasche, and, as we have pointed out, in theory, the addition of nitrogen to liquid carbon dioxide would be expected to produce more solid carbon dioxide; a result beneficial to Hasche, but not to Mapes.
The Daney patent disclosed a fire extinguishing medium with a two-fold purpose. The first was to smother the blaze; the second to coat the combustible material with a chemical compound to prevent re-ignition. One of its primary uses was said to be combating forest fires. Carbon dioxide and nitrogen contained in a storage tank were used to expel water and the chemicals upon the fire. Defendant contends that this use of carbon dioxide and nitrogen in a separate container anticipates the patent in suit since it could be separately used as an extinguisher. However, Daney was not concerned with the problem of preventing the formation of dry ice in the discharge passage. The Daney patent in no way teaches the solution of the problem solved by Mapes and does not anticipate the patent in suit.
*461 The teachings of the numerous patents and publications urged by the defendant are specifically set out in our findings and need not be repeated in this opinion. None of them anticipate the patent in suit.
4. Plaintiff also claims a patent on a method of providing a continuous discharge of liquid carbon dioxide at very low temperatures. This method consists of forming, at normal temperatures, a charge in the container capable of exerting a pressure of about 200 pounds per square inch at — 60° F., but whose weight is less than the weight of a normal charge of carbon dioxide, the charge consisting of carbon dioxide and some gas inert to carbon dioxide, whose critical temperature is below —80.5° F. The container may be charged either by injecting the carbon dioxide first or the nitrogen or other gas first.
The first four claims specify that the weight of the charge must be less than the weight of a normal charge of carbon dioxide.
Claim 6 teaches the formation of a charge by the injection of compressed gas sufficient to exert a pressure of 200 pounds at — 60° F., and then filling the container with carbon dioxide to between 50 per cent and 95 per cent of its normal filling capacity.
Claim 7 is on a method of providing for a continuous discharge of carbon dioxide at —60° F. by the injection of sufficient gas, inert to carbon dioxide, to produce a pressure of from 200 to 500 pounds at —70° F. and filling the container with carbon dioxide to from 50 per cent to 95 per cent of its normal filling capacity. The gas to be used must be capable of exerting a pressure, coacting with carbon dioxide, to produce a pressure of 200 pounds per square inch at —60° F.
The Patent Office issued a patent on each of the method claims. No satisfactory reason has been assigned for us to hold that this action was incorrect.
5. The trial commissioner set forth in findings 38 to 40 the methods and charges used by the Air Force. In finding 42 he sets forth his conclusions as follows:
42. The first method of charging set forth in finding 38, responds in terms and in spirit to the recital of *462 method claims 1,2,4,6 and 7 in suit. The second method of charging, as set forth in finding 39, in which the nitrogen is added to carbon dioxide already in the cylinder, responds in terms and in spirit to the recital of method claim 3 in suit. The charge set forth in finding 40 responds in terms and in spirit to the recital of claims 8,9,’ and 10 in suit. The several claims in suit cover methods and charges admittedly used by the defendant.
There can be no doubt of the correctness of his conclusions. Claims 1, 2, 3, 4, 6, 7, 8, 9 and 10 of Mapes’ patent are valid and have been infringed by defendant and judgment will be entered to that effect.
The amount of reasonable and entire compensation to which plaintiff is entitled will be determined in further proceedings before a trial commissioner.
It is so ordered.
Need, Justice {Bet.), sitting by designation; MaddeN, Judge; Littleton, Judge; and Jones, Chief Judge, concur.
FINDINGS op fact
The court, having considered the evidence, the report of Commissioner Donald E. Lane, and the briefs and argument of counsel, makes findings of fact as follows:
1. This is a patent suit arising under the provisions of Title 28, 17. S. C., Section 1498, for reasonable and entire compensation for unauthorized use by the defendant of the invention described in and covered by United States Letters Patent No. 2,521,526, issued September 5,1950, to the plaintiff as assignee of Daniel Mapes. Plaintiff, Specialties Development Corporation, is a corporation of the State of New Jersey, and has owned said Mapes patent continuously since its issuance.
2. The Mapes patent resulted from an application for patent filed on January 11, 1944. The patent is entitled “Liquid Carbon Dioxide Suitable For Discharge At Low Temperatures And Method of Filling Storage Containers For Confining The Same”. The patentee, Daniel Mapes, was *463 not in the employ or service of the defendant when be made the invention described in and covered by the patent in suit.
3. The parties agreed at pretrial to a separation of issues for trial, and that the issues of validity of the patent and of infringement of the patent by the defendant be first determined upon full proofs, findings of fact, and argument of counsel. The accounting period, if any, is from September 5,1950 to March 5,1953. Determination of the extent of liability is deferred until after an opinion by the court on the validity and infringement issues.
4. The Mapes patent in suit describes and claims a method of forming a charge of carbon dioxide and an inert gas in a storage container, and also describes and claims a charge of carbon dioxide and inert gas confined under pressure. The Mapes patent specification states that carbon dioxide is used extensively on la,nd vehicles, vessels and aircraft as a fire-extinguishing medium and as a medium for operating pressure-operable devices in the event of an emergency. Carbon dioxide may be used for portable fire extinguishers, built-in fire-extinguishing systems, fuel tank purging systems, gun chargers, emergency operating systems for bomb-bay doors or landing gear. The specification continues by stating that liquid carbon dioxide generally is stored in metallic containers, known as cylinders, which are provided with suitable discharge valves for releasing the carbon dioxide. Such containers can safely withstand relatively high working pressures and are usually provided with safety discharge means to release any excessive pressure. The Mapes specification illustrates and describes such a cylindrical storage container, but the actual construction of the container forms no part of the specific methods and charge defined in the claims in suit. In order to more easily understand the claimed invention and the problems solved, a portion of the Mapes patent drawing is reproduced.
5. Referring to the Mapes drawing, there is shown the upper portion of a metallic container 10 which has a generally cylindrical shape and is adapted for storing carbon dioxide. The container is constructed in the usual manner, *464 and, for example, may be of tbe type adapted to safely withstand internal pressures of about 3,600 pounds per square inch. One end of tbe container is provided witb an opening 12 in wbicb is secured a suitable valve or discharge fitting 14. The valve 14 has an inlet 16, to which is attached a syphon tube 18, the latter extending downward into the container 10. The valve 14 has an outlet 20 for connection to a hose, distributing system, or spray horn, not illustrated. The outlet 20 may also be used for coupling a pressure gauge thereto or for filling the container 10. Intermediate the inlet 16 and the outlet 20, a valve seat 22 is provided for cooperating with a valve member 24 to control the discharge of carbon dioxide from the container. A manually operated handwheel 26 and a threaded stem 28 are shown to seat and unseat the valve member 24. A safety discharge assembly 30 is provided intermediate the inlet 16 *465 and the valve seat 22 for discharging carbon dioxide to the atmosphere in the event the pressure within the container 10 exceeds a safe working pressure. The safety discharge is controlled by a disc 32 adapted to be ruptured when the pressure exceeds a predetermined value.

*464

*465 6. One of the problems solved by the Mapes method of filling and by the Mapes charge is said to be the elimination of clogging in the passages in the control valve 14. Containers of the type illustrated, filled or charged with a normal amount of carbon dioxide, discharge without clogging at normal temperatures, generally ranging from about 0° to 140° Fahrenheit. At subnormal temperatures encountered at high altitudes or in the arctic regions, where the temperatures may be as low as —65° F., or even lower, attempts to discharge a normally filled or charged container often result in clogging of the discharge control valve with dry ice before the contents of the container can be completely discharged. Another of the problems solved by the Mapes method of filling and by the Mapes charge is the maintenance of adequate pressures to effect rapid discharge of carbon dioxide at subnormal temperatures. As the ambient temperatures fall below 0° F., the pressure of normal carbon dioxide decreases. The Mapes specification states that a carbon dioxide pressure of 160 pounds per square inch at —40° F. decreases to about 80 pounds per square inch at — 60° F., and to about 70 pounds per square inch at —65° F. Such low pressures may fail to effect rapid discharge of carbon dioxide from the container even if the discharge passages are not completely clogged. Another problem with normal charges is the formation of solid carbon dioxide in the container. It is stated that upon releasing low temperature liquid carbon dioxide from a container, the expansion of a portion thereof refrigerates some of the remaining carbon dioxide. This may result in the formation of a solid carbon dioxide in the container which cannot be discharged at said low temperatures.
7. The Mapes specification discloses that the problems of clogging, insufficient discharge pressures, and solidification of carbon dioxide in the container at subnormal temperatures may be avoided by including with the carbon dioxide *466 charge a gas or mixture of gases having the property of existing in a gaseous state at the subnormal temperatures encountered in high altitudes and in arctic regions, temperatures as low as —60° F. The specification states that the gas or gases used with the carbon dioxide may be air, argon, carbon monoxide, helium,- hydrogen, krypton, néon, nitrogen and oxygen, and that such gases continue to exist as gases under pressure of at least 200 pounds per square inch at temperatures as low as —60° F. The specification states that for all-around purposes, nitrogen is the preferred gas because of its comparative low cost, its general availability, and its inert properties. The critical temperature of nitrogen is —231° F. Critical temperature is defined as the temperature above which a gas cannot be liquefied by an increase in pressure, and is different for different gases. The critical temperatures of the several gases noted above ■vary from —80.5° F. for neon down to —450° F. for helium.
8. The Mapes specification states that the preferred method of filling a container comprises first charging the container with a desired quantity of a gas and then introducing into the container a desired quantity of liquid carbon dioxide. Alternatively, a desired quantity of solid carbon dioxide may be placed in the container, and thereafter the container may be charged with a desired quantity of gas, either while the carbon dioxide is in its solid state or after it has been permitted to liquefy by exposing the container to normal atmospheric temperatures or by heating the container. The desired quantity of gas may be determined by charging the empty container with gas having a known pressure at a given temperature. For example, the container may be charged with gas having a pressure between 200 and 500 pounds per square inch at 70° F. Alternatively, the desired quantity of gas may be determined by noting the increase in weight of the container and its contents when the gas has been introduced.
9. Before the Mapes invention, containers of carbon dioxide had been used for all of the purposes mentioned in finding 4. In such uses the containers are required by Interstate Commerce Commission safety regulations to be filled with a quantity of carbon dioxide not exceeding in weight 68 *467 percent of the weight of the water which would completely fill the container with the water at a temperature of 4° centigrade (39.2° F.). Such a 68 percent filling is known as normal filling. Prior to the Mapes invention, containers having a normal filling of only carbon dioxide failed to operate properly at extremely low temperatures, and the problems became more acute as aircraft were flown at higher altitudes and operations were conducted in more frigid climates. These problems were of the character set forth in finding 6 above.'
10. In a container having a normal filling of carbon dioxide, the carbon dioxide will exist as all gas at temperatures above 87.8° F., the critical temperature of carbon dioxide. At temperatures between the 87.8° F. critical temperature and the — 69.9° F. triple point temperature of carbon dioxide, the carbon dioxide in the container will exist both as a liquid and a gas. At temperatures below the — 69.9° F. triple point temperature, the carbon dioxide in the container will exist both as a solid and a gas. At the triple point temperature, — 69.9° F., carbon dioxide can exist in all three phases, that is, as a gas, a liquid, and a solid. At that triple point temperature, if the pressure is increased above about 60 pounds per square inch gauge (75 pounds per square inch absolute pressure), the carbon dioxide can exist as a solid and a gas, but not as a liquid. The Mapes specification indicates that the gauge pressure of carbon dioxide gas within a container having a normal filling is about 2,525 pounds per square inch at a temperature of 140° F., is about 553 pounds per square inch at a temperature of 40° F., and is about 80 pounds per square inch at a temperature of — 60° F.
11. The problem, broadly stated, was to discover how to discharge carbon dioxide from a storage container at subnormal temperatures of the order of —60° F. as effectively as normal charges of carbon dioxide had been discharged theretofore from containers at ambient temperatures in the range of —20° F. to 140° F. The Mapes invention solved the low temperature problems with the addition of certain inert gas or gases to the carbon dioxide. The solution provided for the continued use of readily available supplies of carbon dioxide plus the use of readily available other gases, *468 and also avoided need for cumbersome or heavy expedients such as insulation and/or heaters. The use of carbon dioxide and nitrogen together has been characterized as a winterised, carbon dioxide charge, and methods of charging a storage container with both carbon dioxide and nitrogen have been characterized as winterization.
12. Plaintiff relies on claims 1, 2, 3, 4, 6, 7, 8, 9 and 10 of Mapes patent 2,521,526. These patent claims read as follows:

Claim 1

A method of providing for the continuous discharge, from a closure controlled restricted orifice, of carbon dioxide in a continuous stream even when the temperature at the orifice falls to —60° F., said method comprising forming, at a temperature within the normal range of atmospheric temperatures, in a storage container provided with said orifice a charge capable of exerting on said container at —60° F. a pressure in excess of about two hundred pounds per square inch and consisting principally of carbon dioxide and having as a second component a gas inert to carbon dioxide and having a critical temperature below —80.5° F., the weight of the charge being less than that of a normal charge of carbon dioxide.

Claim 8

A method of forming a charge in storage containers which comprises the steps of introducing into the containers at normal temperature a predetermined quantity of carbon dioxide and a predetermined quantity of compressed gas which is capable of exerting a sufficient pressure at — 60° F. so that the charge of said gas and carbon dioxide will be confined under a pressure of at least about 200 pounds per square inch absolute at a temperature of about —60° F., the weight of the charge being less than that of a normal charge of carbon dioxide.

Claim §

A method of forming a charge in storage containers which comprises the steps of first partially filling the containers at normal temperatures with carbon dioxide and then introducing a gas into the containers which gas is capable of exerting a sufficient pressure at —60° *469 F. so that the charge of said gas and carbon dioxide will be confined under a pressure of at least about 200 pounds per square inch absolute at a temperature of about —60° F., the weight of the charge being less than that of a normal charge of carbon dioxide.

Claim 4

A method of forming a charge in storage containers which comprises first charging the containers at normal temperature with a compressed gas and then introducing a predetermined quantity of liquid carbon dioxide, said gas being capable of exerting a sufficient pressure at —60° F. so that the charge will be confined under a pressure of at least about 200 pounds per square inch absolute at a temperature of about —60° F., the weight of the charge being less than that of a normal charge of carbon dioxide.

Claim 6

A method of forming a charge in storage containers which comprises first charging the containers at normal temperature with a compressed gas, and then introducing into the containers a predetermined quantity of liquid carbon dioxide to fill the same to between about 50% and about 95% of their normal filling capacity, said gas being capable of exerting a sufficient pressure at — 60° F. so that the charge will be confined under a pressure of at least about 200 pounds per square inch absolute at a temperature of about —60° F.

Claim 7

A method of providing for the continuous discharge, from a closure controlled outlet opening, of carbon dioxide in a continuous stream even when the temperature at the opening falls to —60° F., said method comprising introducing into a storage container a charge of gas having a pressure of between about 200 and about 500 pounds per square inch when confined in the container at a temperature of about 70° F., and then introducing liquid carbon dioxide into the container to fill the same to between about 50% and about 95% of its normal filling capacity, said gas being inert to carbon dioxide, having a freezing point below that of carbon dioxide and being capable of coacting with the carbon dioxide to exert on the container a pressure in excess of about 200 pounds per square inch at — 60° F.

*470
Claim 8

A charge of fluid medium confined under pressure in a fluid-tight storage container having a closure controlled discharge passage, said charge comprising principally carbon dioxide and a compressed gas inert to carbon dioxide having a critical temperature below —80.5° F., the weight of the charge in relation to the volumetric capacity of the container being such that the charge is safely confineable in the container without building up excessive pressures at temperatures as high as about 140° F. and said other gas being present m proportion to the carbon dioxide to coact with the carbon dioxide to cause the charge to exert on the container a pressure in excess of about two hundred pounds per square inch at about —60° F., whereby said charge is dischargeable from the container at a relatively high rate at temperatures as low as —60° F. without a tendency to solidify and clog the passage through which it is discharged.

Claim 9

A charge of fluid medium confined under pressure in a fluid-tight storage container having a closure controlled discharge passage, said charge comprising principally carbon dioxide and a compressed gas inert to carbon dioxide having a critical temperature below —80.5° F., the weight of the carbon dioxide being equivalent to between about 50% and about 95% of the normal carbon dioxide filling capacity of the container and the ratio of carbon dioxide to said other gas by weight being between about 8 and about 34 to one and the combined weight of carbon dioxide and said other fas not exceeding the weight of a normal charge of car-on . dioxide whereby the charge is safely confine-able in the container without building up excessive pressures at temperatures as high as about 140° F., and said other gas being present in proportion to the carbon dioxide to coact with the carbon dioxide to cause the charge to exert on the container a pressure in excess of about two hundred pounds per square inch at about — 60° F., whereby said charge is dischargeable from the container at a relatively high rate at temperatures as low as —60° F. without a tendency to solidify and clog the passage through which it is discharged.

*471
Olaim 10

A charge of fluid medium confined under pressure in a fluid-tight storage container having a closure controlled discharge passage, said charge comprising principally carbon dioxide and a compressed gas inert to carbon dioxide having a critical temperature below —80.5° F., the weight of the charge in relation to the volumetric capacity of the container being such that the charge at 140° F. will exert less pressure on the container than a normal charge of carbon dioxide at 140° F. and said other gas being present in proportion to the carbon dioxide to coact with the carbon dioxide to cause the charge to exert on the container a pressure in excess of about two hundred pounds per square inch at about —60°_F., whereby said charge is dischargeable from the container at a relatively high rate at temperatures as low as —60° F. without a tendency to solidify and clog the passage through which it is discharged.
13. Claims 1, 2, 3, 4, 6 and 7 recite methods. Claims 8, 9 and 10 recite a charge. Claim 1 recites a method of providing for the continuous discharge of carbon dioxide, at temperatures of —60° F., comprising forming a charge in a storage container at normal temperatures, the charge being capable of exerting at —60° F. a pressure in excess of 200 pounds per square inch, the charge consisting principally of carbon dioxide and including a gas inert to carbon dioxide and having a critical temperature below —80.5° F., and the weight of the charge being less than the weight of a normal charge of carbon dioxide. Claim 2 recites a method of forming the charge by introducing a predetermined quantity of carbon dioxide and a predetermined quantity of a compressed gas into the container. Claim 3 is similar to claim 2 but recites that the container is partially filled with •carbon dioxide and then the other gas is introduced. Claim 4 is like claim 3 except that the container is first charged with the gas and then the carbon dioxide is introduced in liquid form. Claim 6 is similar to claim 4 but recites that the liquid ■carbon dioxide fills the container to .between 50 and 95 percent of its normal filling capacity. Claim 7 is like claim *472 1 but recites that the carbon dioxide is in liquid form and fills the container between 50 and 95 percent of normal filling, and that the inert gas has a freezing point below that of the carbon dioxide. Claim 8 recites a charge of fluid medium under pressure being principally carbon dioxide and a gas inert to carbon dioxide with a critical temperature below —80.5° F., the weight of the charge in relation to the volumetric capacity of the container being such that the charge is safely confineable without building up excessive-pressures at 140° F., and the gas to carbon dioxide ratio being such that the charge is under in excess of 200 pounds-per square inch pressure at —60° F. Claim 9 is like claim 8 in reciting a charge of fluid medium under pressure and adds that the carbon dioxide weight is 50 to 95 percent of normal filling, that the ratio of carbon dioxide to other gas,, by weight, is between 8 and 34 to one, and that the combined' weight of the carbon dioxide and the other gas does not exceed the weight of a normal carbon dioxide charge. Claim 10 is similar to claim 8 but specifies that the weight of the charge is such that at 140° F. the charge exerts less pressure on the container than a normal charge of carbon dioxide at 140° F. The term normal filling used in the claims in suit, refers to filling defined in the Interstate Commerce Commission regulations referred to in the Mapes specification and in finding 9 above.
14. The file history of the Mapes patent application shows that the patent examiner rejected certain generic claims as-unpatentable over prior patents to Martin, et al. 1,938,036, and Hamilton 1,264,390. After Mapes’ attorney argued that, the claims called for a compressed gas having a lower critical temperature than that of carbon dioxide, certain claims were indicated as allowable by the examiner. After Mapes’ attorney amended certain claims to recite that the introduced gas is capable of exerting a pressure of at least 200 pounds per square inch absolute at —60° F., additional claims were indicated by the examiner to be allowable. On March 8, 1948, the patent examiner suggested to Mapes the wording of a claim for use as the issue in a proposed interference proceeding. The suggested claim was added to the Mapes application and was substantially the same as claim 1 here in suit.
*473 15. An application for letters patent on the same general subject matter of the Mapes application was filed on November 24,1944, Serial Number 564970, by one John H. Cantlin. The Cantlin application was filed more than eleven months after the Mapes application, and indicates that Cantlin was an officer in the United States Army. The Cantlin application was filed as a no-fee case tinder the provisions of the Act of March 3, 1883, as amended April 30, 1928, and was prosecuted by counsel for the Army Air Force. This Cantlin application stated:
Pursuant to the present invention, the carbon dioxide container or system is supercharged with dry nitrogen gas, preferably under sufficient pressure to insure proper functioning of the apparatus at all temperatures between approximately —70° F. and +160° F.
In seeking the allowance of claims to said invention, Army Air Force counsel argued—
Applicant’s invention having been fully accepted and put to use in answer to a heretofore unsolved difficulty there would seem to be no room for doubt as to the operativeness of the invention. The invention has been adopted by the U. S. Army Air Forces as shown by the Technical Order. The observance of such Orders is mandatory in the Air Forces and the promulgation thereof is based on general acceptance of the improvement by means of extensive service tests, not on a mere suggestion by some one individual, nor on the basis of a few successful experiments.
On September 25, 1947, the patent examiner cited against the Cantlin application the patent issued to Hasche 1,971,106, dated August 21, 1934. In an action mailed to counsel for Cantlin on December 12, 1947, the patent examiner withdrew the Hasche patent as a reference against the claims in the case. On March 8, 1948, the patent examiner suggested to Cantlin the identical claim he simultaneously suggested to Mapes, as noted in finding 14 above. The suggested claim was thereupon added to the Cantlin application.
16. The patent examiner who examined both the Mapes application and the Cantlin application instituted interference proceeding 83,816 between Mapes and Cantlin to determine which applicant was the first inventor of the subject *474 matter recited in the claim he had suggested to both applicants. In statements under oath filed in the interference proceeding, Mapes alleged that he made the invention between January 27, 1940, and May 21, 1940, and Cantlin alleged that he made the invention during the period from May 1, 1943, and May 22, 1943. The interference file indicates that attempts to settle the interference were made during 1949 and were unsuccessful. Thereafter, in November 1949, Cantlin belatedly moved to dissolve the interference and alleged that the claim was unpatentable over—
Mapes 1,961,371, June 5,1934.
Essex For Safety, National Fire Protection Co., Ltd., Richmond, Surrey, England, March, 1938.
Industrial Safety, National Fire Protection Co., Ltd., Petersham Road, Richmond, Surrey, England, 1939.
Automatic Fire Protection, Mechanical World and Engineering Record, London, April 28, 1939.
Aircraft Fire-Fighting Equipment, Engineering, London, August 25,1939.
British Patent No. 466,599, accepted June 1,1937.
Methyl Bromide vs Carbon Dioxide for Quenching Aircraft Fires, C. H. Lindsay, Aero Digest, October 1, 1944.
Aircraft Fire-Fighting Equipment, The Engineer, London, August 25,1939.
Industrial Safety, The National Fire Protection Co.r Ltd., Petersham Road, Richmond, Surrey, Cover page and pages 1 and 2 thereof, October 1, 1937, Columbia University.
Copies of the above publication citations were attached to the motion filed in the Patent Office. The Cantlin motion to dissolve, signed by present counsel for the defendant herein, was dismissed by the patent interference examiner. A motion for judgment on the record filed by Mapes resulted in an order to show cause against Cantlin, and Cantlin thereafter filed a formal abandonment of the interference contest on March 29, 1950. The interference was then dissolved, and the Patent Office issued the Mapes patent in suit with the interference claim, slightly amended, appearing as Mapes claim 1, one of the claims here in suit.
17. The defendant now urges that the Mapes claims in suit are invalid and unpatentable over the following patents and publications:
*475 Levy, French pat. 697,341, Oct. 27,1930.
Muchka, Austrian pat. 78,916, June 25, 1920.
Daney, U. S. pat. 1,062,894, May 27,1913.
Muchka, U. S. pat. 1,413,285, Apr. 18, 1922.
Hodman, et al., U. S. pat. 1,736,464, Nov. 19, 1929.
Odell, U. S. pat. 1,990,499, Feb. 12,1935.
Phillips, et al., French pat. 829,186, Mar. 14,1938.
Hasche, U. S. pat. 1,971,106, Aug. 21,1934.
C. H. Lindsay, Aero Digest, p. 120, Oct. 1, 1944.
Essex For Safety, Nat’l Fire Protection Co., 19 pp., March 1938.
Industrial Safety, Nat’l Fire Protection Co., 32 pp., England 1939.
Automatic Fire Protection, Mech. World & Eng. Rec., pp. 423-425, Apr. 28,1939.
Aircraft Fire-Fighting Equipment, The Engineer, pp.. 217-219, Aug. 25, 1939.
Galitzine, Annalen der Physik und Chemie, vol. 41, pp. 596-599, Leipzig 1890.
Connelly, U. S. pat. 170,060, Nov. 16,1875.
18. Defendant’s expert, Dr. G. W. Morey, testified that he thought all of the several claims in suit are covered by the prior patents to Hasche (U. S.), Muchka (Austrian), and Levy (French). Dr. Morey then testified that he thought the Hasche patent apparatus for the manufacture of solid carbon dioxide was inoperative at the temperature specified in the Hasche patent specification, a temperature of —100° F. for the carbon dioxide in the tank (9), because-at that temperature, a temperature below the triple point temperature, the carbon dioxide would freeze solid. Dr. Morey also testified that the Austrian Muchka patent disclosure contained nothing to indicate that Muchka had in mind using liquid carbon dioxide, and testified that he thought it not very probable that the French Levy patent disclosure contemplated the use of carbon dioxide.
19. Hasche patent 1,971,106 relates to the separation of gases from gaseous mixtures, and, more particularly, to the manufacture of solid carbon dioxide. This patent discloses-apparatus for compressing, cooling, drying, refrigerating,, condensing, further cooling, collecting, and expanding the carbon dioxide gas in mixed combustion gases containing 15 to 18 percent carbon dioxide. The product collected by the Hasche apparatus is said to be solid carbon dioxide. Said *476 Hasche apparatus will not operate as described in the Hasche patent specification since the specification states that the temperature in the tank (9) for liquid carbon dioxide is about —100° F. At such a temperature, any liquid carbon dioxide in said tank would solidify and would not pass to the expansion nozzle (11) of the dry ice tank (10). A later Hasche patent, 2,011,550, not relied upon by defendant, also discloses apparatus for making solid carbon dioxide from mixtures of gases, and omits said low-temperature tank of the Hasche 1,971,106 patent. The combustion gas mixture from which Hasche proposed to manufacture solid carbon dioxide consisted mainly of carbon dioxide gas and nitrogen gas. There is no teaching in Hasche 1,971,106 that nitrogen or any other gas inert to carbon dioxide may be added to a storage container to provide for the discharge of carbon dioxide in a continuous stream at subnormal temperatures of the order of —60° F. There is no disclosure in the Hasche patent that the weight of such a charge should be less than the weight of a normal charge of carbon dioxide. The specific disclosure of the Hasche patent is inoperative and does not respond to the terms of and does not teach the invention defined in any of the several Mapes patent claims here in suit. Although Hasche 1,971,106 was not actually cited by the patent examiner against the Mapes application for patent, said Hasche patent was referred to in the Cantlin application by said patent examiner who considered the similar subject matter of both the Mapes and the Cantlin applications for patents. The Hasche patent disclosure is concerned with the production of dry ice within an apparatus for the separation of gases, whereas the invention here in suit is concerned with preventing the formation of dry ice within conventional apparatus.
20. Muchka Austrian patent 78916 relates to apparatus for preventing and extinguishing fires within closed storage tanks containing gasoline, petroleum and the like. This patent shows a submerged pipe system for introducing carbonic acid, nitrogen or a mixture of inert gases below the surface of the stored inflammable liquids to dilute the inflammable vapors in the closed space above the stored liquids. This Austrian patent does not mention the use of nitrogen *477 to discharge liquid carbon dioxide at subnormal temperatures, does not mention clogging, and does not mention methods of charging carbon dioxide storage containers. The disclosure of the Austrian Muchka patent does not respond to the terms of and does not teach the invention defined in any of the several Mapes patent claims in suit.
21. Levy French patent 697,341 relates to fire-extinguishing apparatus for use on aircraft “even at extremely low temperatures.” A translation of this patent specification indicates that fluid stored in liquid form is utilized as the fire-extinguishing medium, but there is no mention of what particular liquids were contemplated. The Levy patent states that an empty space in the container storing the fire-extinguishing fluid should be filled with a suitable gas under pressure, such as atmospheric air. The Levy storage container is described as made of brass by stamping and is provided with solder seals and with a filling valve of the type used for bicycle tires. Alternatively, the gas pressure may be produced within the Levy container by the chemical reaction of reagents contained in a perforable wafer in the container. Such a container would not withstand carbon dioxide and gas pressures of the character involved in the Mapes invention. The Levy patent does not mention carbon dioxide or nitrogen. It is clear that the disclosure of the Levy French patent does not respond to the terms of and does not teach the invention defined in any of the several Mapes patent claims in suit. It appears likely that the Levy French patent contemplated fire-extinguishing fluids such as methyl bromide.
22. Daney patent 1,062,894, issued in 1913, discloses a method of extinguishing forest fires by using gases from a mixture of liquid nitrogen and carbon dioxide in one container to expel water, aluminum nitride and calcium cyana-mide from another container. The Daney specification does not suggest or teach that the water, aluminum nitride and calcium cyanamide could be discarded, or that the carbon dioxide and nitrogen could be used alone to fight fire. Defendant’s expert testified that liquid nitrogen cannot exist above a very low temperature, and that Daney, the patentee, did not know what he was talking about when he specified *478 that the nitrogen in the container should be liquid. Nitrogen can be liquefied only at a low temperature below the lowest temperature at which carbon dioxide can exist in liquid form. The Daney patent does not mention discharge of carbon dioxide in a continuous stream at subnormal temperatures, nor does it mention forming a charge capable of exert-áng a pressure in excess of about two hundred pounds per •square inch at —70° F. The Daney patent disclosure does not respond to and does not teach the invention defined in •any of the claims here in suit.
23. Muchka U. S. patent 1,413,285, issued in 1922, discloses the use of exhaust gases from an internal combustion •engine to form a protective gas for superposition on stored highly inflammable liquids. Engine exhaust gases consisting of carbon dioxide, nitrogen and water vapor are cooled, purified, collected and compressed for delivery to stored inflammable liquids. This Muchka disclosure likewise fails to respond to and fails to teach any of the inventions defined in the claims in suit.
24. Kodman, et al. patent 1,736,464, issued in 1929, relates to means for obtaining an inert atmosphere capable of removing oxygen and moisture from air within containers for •electrical apparatus immersed in insulating oil. The purpose is to prevent deterioration of the insulating oil by oxygen. Hodman discloses the use of chemicals such as sodium hydro-sulphite, sodium bicarbonate and water to remove oxygen :from the air and to result in a mixture of nitrogen and carbon ■dioxide. The Hodman disclosure does not mention and is not concerned with methods of charging carbon dioxide storage containers, and is not concerned with the composition ■or the weight of charges including liquid carbon dioxide. The Rodman patent does not teach the invention defined in the claims in suit.
25. Odell patent 1,990,499, issued in 1935, relates to a fluid ■fuel package comprising a combustible fuel, such as liquid propane, butane and the like, in a closed container in contact with a compressed non-oxidizing expelling gas, the gas being substantially insoluble in the combustible fuel and being moisture-free. Since combustible fuels such as butane have •a low vapor pressure at low temperatures, Odell discloses *479 the use of gases such, as nitrogen, hydrogen, stack gas, water gas, engine exhaust gas, carbon dioxide or the like to expel the combustible fuel from the package. The Odell patent teaches that fluid having a vapor pressure less than fifteen pounds per square inch gauge at 10° F. may be expelled from a storage container by storing in contact with the fuel a compressed non-oxidizing gas sufficient to provide an initial pressure of 45 to 90 pounds per square inch gauge at 10° F. The Odell patent relating to the discharge of combustible fuels does not respond to and does not teach the invention defined in the claims in suit relating to the discharging of fire-extinguishing carbon dioxide.
26. The Essex For Safety article, published in 1938, relates to the use of methyl bromide for the fire protection of aircraft. The Essex publication teaches that methyl bromide is more effective than either carbon dioxide or carbon tetrachloride for extinguishing fires. The article states that a carbon dioxide installation will be approximately ten times as heavy and will be four times the volume of a corresponding installation using methyl bromide. This article states that an automatic extinguisher set for aircraft may contain 5 pounds of methyl bromide under 150 pounds per square inch pressure of nitrogen sealed in a drawn copper container by a pierceable copper seal five-thousandths of an inch in thickness. There is no mention in the Essex publication concerning use of nitrogen under pressure in carbon dioxide type extinguishers. Methyl bromide has a freezing point of about —135° F., and has no triple point. Methyl bromide is not the equivalent of carbon dioxide, and its physical properties are considerably different. The Essex For Safety article does not contain any disclosure that responds to or teaches the invention defined in any of the Mapes patent claims here in suit.
27. Phillips & Pain French patent 829,186, published in 1938, relates to portable fire extinguishers containing a liquid under pressure. The patent relates particularly to an extinguisher having a puncturable diaphragm seal at the bottom of the container in communication with a manual control valve and delivery spout at the top of the container. The French patent specification states that the container is *480 sufficiently strong to withstand, upon being placed in service, a pressure of several kilograms per square centimeter. A pressure of two kilograms per square centimeter is the equivalent of about 28.4 pounds per square inch, whereas a pressure of 200 pounds per square inch involves a pressure in excess of 14 kilograms per square centimeter. The French specification mentions methyl bromide as the fire-extinguishing liquid and states that at very low temperatures, when the vapor pressure becomes insufficient, the free space above the liquid is additionally charged with a compressed gas such as nitrogen. The French specification does not mention carbon dioxide, does not mention clogging, and does not mention operations at subnormal temperatures of the order of — 60° F. with pressures as great as 200 pounds per square inch. The Phillips & Pain French patent disclosure does not respond to or teach the invention defined in any of the claims in suit.
28. Connelly patent 170,060, issued in 1875, relates to the use of carbonic acid gas alone or in combination with water, air, or other gas or liquid, to extinguish fires in large closed tanks of oil or other fluid hydrocarbons. This early patent cited by defendant is no longer relied on by defendant.
29. The articles entitled “Industrial Safety”, “Automatic Fire Protection”, and “Aircraft Fire-Fighting Equipment”, published in 1939, all relate to use of the “Essex” methyl bromide fire-extinguishing equipment by the British Air Ministry and by British industry. These articles are cumulative to the “Essex For Safety” article discussed in finding 26, and likewise do not disclose or teach the invention defined in the claims in suit. These publications taught the art that methyl bromide possessed certain advantages over, and was considered better than, carbon dioxide. The publications did not teach how to prevent carbon dioxide from clogging discharge passages at subnormal temperatures of —60° F.
30. Defendant has referred to an article by C. H. Lindsay, entitled “Methyl Bromide vs Carbon Dioxide for Quenching Aircraft Fires”, published in the October 1, 1944, issue of Aero Digest. This article teaches that a methyl bromide fire-extinguishing system for aircraft has certain advantages over a carbon dioxide system at extreme temperatures. This *481 publication was cited in interference proceeding 83,316, Cantlin- v. Mapes, noted in finding 16. The date of said publication is subsequent to the filing date of the Mapes patent application and is too late to be considered as a reference anticipating or limiting the claims in suit.
31. Defendant has also referred to a foreign publication “Annalen der Physik und Chemie”, Yol. 41, published in Leipzig in 1890, and referred particularly to an article by Galitzine on pages 596-599 thereof. The article reports Galitzine’s calculations and observations with respect to tests of mixtures of nitrogen and carbon dioxide which showed deviations from Dalton’s law of partial pressures. Tabulated data in the Galitzine report do not extend to temperatures below +35.9° F. The Galitzine article does not relate to methods of charging carbon dioxide storage containers or to charges for use in such containers at subnormal temperatures of —60° F. and at pressures in excess of 200 pounds per square inch. The Galitzine article does not teach the invention defined in any of the claims in suit.
32. Defendant has referred to certain gas laws in contending that the claimed invention is the logical result of an application of known laws of physical chemistry. Dalton’s law of partial pressures states that the total pressure in a container of mixed gases is equal to the sum of the pressures exerted by each of the gases. Gay-Lussac’s law, called the law of volumes, states that when two or more gaseous substances combine to form a gaseous mixture, the volume of the product is either equal to the sum of the volumes of the factors or is less than, and bears a simple ratio to, this sum. Boyle’s law states that when a gas is subjected to compression and kept at constant temperature, the product of the pressure and volume is a constant quantity, i. e., the volume is inversely proportioned to the pressure. Boyle’s law is approximately true for most gases throughout a considerable range of pressure. Charles’ law states that at constant pressure, the volume of a given mass of gas increases for a given rise in temperature, or decreases for a given fall, by a definite fraction of its volume. Defendant’s expert testified that the gas laws of Dalton and Charles do not apply to gases in their liquid phase, and that the Mapes subject matter in suit *482 was concerned, with, carbon dioxide in its liquid phase. Defendant’s expert testified that not one of the prior 'art references he discussed contained any teaching of the problem of clogging or stoppage of a carbon dioxide fire extinguisher or life raft inflating equipment or other container using carbon dioxide under low temperature conditions.
33. Defendant’s expert testified that Mapes, in producing-more dry ice and at the same time preventing the nozzle from clogging, was going contrary to what would be expected' from the laws of science applicable to the situation. Plaintiff’s technical expert testified that he knew of no scientific-theory available in 1940-1944 from which the results obtained by winterization could have been predicted. The-methods of charging storage containers with carbon dioxide- and an inert gas, and the charges so produced, disclosed and1 claimed by the Mapes patent in suit, constitute subject matter that would not have been obvious in 1944 to a person-having ordinary skill in the art of compressed gases and having knowledge of liquid carbon dioxide and of the gas-laws and prior art mentioned in these findings.
34. Plaintiff’s technical expert testified that tests show that in the Mapes winterized charge, substantially 35 percent of the nitrogen in the charge is contained in the liquid carbon dioxide at —54° F. He testified that tests show that a substantial portion of the nitrogen added to the storage-container passed out of the container with and during discharge of the liquid carbon dioxide. His testimony indicates-that the presence of nitrogen in fresswre solution in the liquid' carbon dioxide prevents the evaporation and cooling of liquid carbon dioxide in the discharge passages, prevents the formation of clogging dry ice in the discharge passages, and sustains the carbon dioxide in liquid phase for unimpeded, rapid flow from the storage container to the discharge outlet. Such results could not have been predicted in 1944 from application of the general laws of physical chemistry noted' in finding 32.
35. Office of Scientific Eesearch and Development Eeport No. 3101, dated January 11,1944, the filing date of the patent* in suit, describes the progress of investigations made for the-defendant under a contract with the Massachusetts Institute- *483 of Technology with respect to the problem of too slow inflation of life rafts by carbon dioxide charges at subnormal temperatures. The report discusses the problem of carbon dioxide plugging the valves and outlet manifolds at temperatures in the range —60° to —40° F. The report suggests-several methods of improving operations at low temperatures, such as substitution of dry compressed air for carbon dioxide, substitution of nitrous oxide for carbon dioxide,, redesign of the manifold system, use of mixtures of carbon dioxide and nitrous oxide, heating, and the use of a non-condensable gas such as air or nitrogen and liquid carbon dioxide together. With respect to the last suggestion, the report states:
* * * It is understood that this solution has been investigated experimentally by a C02 company, and the results communicated some months ago to the Air Forces.,
* # # * #
36. Office of Scientific Eesearch and Development Report. No. 3525, dated April 25, 1944, describes further progress; on the life raft inflation investigations noted in the previous-finding. The summary of the April report includes the following statement:
* * * * *
These tests in air show:
*****
(c) _ For liquid discharge of C02 [carbon dioxide]! plugging can be eliminated and a satisfactory discharge-obtained in several ways:
* * * * *
by reducing the C02 charge from 3.25 to 2.75 lb. and adding enough N2 [nitrogen] gas to increase the pressure in the bottle by 400 pounds per square inch, thus making it possible to employ standard distributor caps * * *.
*****
The summary indicates that other methods and charges including nitrous oxide, carbon dioxide with nitrous oxide, and1 reducing the area of discharge orifices in the distributor caps, were still under consideration in the investigations. No witnesses were produced to support the statements contained in-either of the two O. S. R. D. reports.
*484 37. The accused methods of charging and the accused charges are set forth in an Air Force publication, plaintiff’s exhibit 2, entitled “Handbook Overhaul Instructions, Airborne C02 Fire Extinguisher System,” dated January 12, 1950, numbered AN 03-45CA-2. Defendant conceded that the instructions set forth in this handbook for recharging carbon dioxide cylinders have been followed by the defendant at least once during the period between the issuance of the Mapes patent in suit on September 5,1950, and the filing of this suit on March 5,1953. The accused methods are described in sections 4r-68 through 4-74 on pages 53-55 of the handbook.
38. The defendant’s first method of recharging a carbon dioxide storage cylinder, set forth in section 4-69, includes the steps of allowing nitrogen to flow into the empty cylinder until the pressure reaches 200 pounds per square inch gauge at 70° F., and then charging the cylinder immediately with the proper weight of carbon dioxide. A compensation table is set forth to indicate the proper filling pressure for nitrogen gas at temperatures other than 70° F., the filling pressure varying from 185 to 219 pounds per square inch as the nitrogen gas temperature varies from 30° to 120° F. Another table is set forth to indicate the proper weight of a normal carbon dioxide charge, the weight of carbon dioxide in a cwinterized charge, and the total weight of carbon dioxide and nitrogen in a winterized charge for each of seven different sizes of storage cylinders. This latter table shows that for a cylinder of 646 cubic inches volume which takes a normal charge of 15 pounds of carbon dioxide, a winterized charge for said cylinder will be 11.66 pounds of carbon dioxide plus nitrogen to make a total charge weight of 12.07 pounds.
39. The defendant’s second method of charging is set forth in section A-74 and states that to winterize cylinders already charged with carbon dioxide, the existing charge of carbon dioxide is reduced in weight, if necessary, to the proper tabulated weight for carbon dioxide for a winterized charge, and then nitrogen is added to increase the pressure in the cylinder by 200 pounds per square inch gauge. The weight of the winterized charge is then reduced, if necessary, to the proper total charge weight tabulated.
*485 40. A cylinder of conventional 15-pound size charged in accordance with the defendant’s first method, will contain 11.66 pounds of carbon dioxide plus .41 pounds of nitrogen gas, a total charge weight of 12.07 pounds. Such a charge is less than the 15-pound weight of a normal charge, contains carbon dioxide in an amount about 75 percent of a normal filling capacity, and the ratio of carbon dioxide to nitrogen is approximately 28 to 1 by weight.
41. The Air Force handbook states in section 2-7 that the purpose of the 200 pounds per square inch nitrogen “is to force out the liquid carbon dioxide at such extremely low temperatures as may be encountered at high altitudes, when the pressure of the carbon dioxide itself would be too low for efficiency.” Defendant offered no evidence to controvert the patentee’s testimony that cylinders charged with a winterized charge as set forth in the Air Force handbook would provide for the continuous discharge of carbon dioxide in a continuous stream and would provide a discharge pressure in excess of 200 pounds per square inch at —60° F.
42. The first method of charging set forth in finding 38, responds in terms and in spirit to the recital of method claims 1, 2, 4, 6 and 7 in suit. The second method of charging, as set forth in finding 39, in which the nitrogen is added to carbon dioxide already in the cylinder, responds in terms and in spirit to the recital of method claim 3 in suit. The charge set forth in finding 40 responds in terms and in spirit to the recital of claims 8, 9 and 10 in suit. The several claims in suit cover methods and charges admittedly used by the defendant.
43. Claims 1, 2, 3, 4, 6, 7, 8, 9 and 10 of Mapes’ patent 2,521,526 are valid and have been infringed by the defendant.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the patent in suit is valid and that it was infringed upon by the defendant, and judgment will be entered to that effect. The extent of liability will be determined in further proceedings before a trial commissioner.